USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12.27.18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSE INMAR EVERALDO BERMUDEZ PAIZ,

Petitioner,

-against-

DIRECTOR THOMAS DECKER, et al.,

Respondents.

18-CV-4759 (GHW) (BCM)

**REPORT AND RECOMMENDATION TO THE HON. GREGORY H. WOODS**

**BARBARA MOSES, United States Magistrate Judge.**

Petitioner Jose Inmar Everaldo Bermudez Paiz, an asylum applicant, seeks a writ of *habeas corpus* pursuant to 28 U.S.C. § 2241. Bermudez Paiz presented himself at the border, passed his credible fear interview, and was paroled into the United States pursuant to 8 U.S.C. § 1182(d)(5)(A). On August 11, 2017, after petitioner pled guilty to disorderly conduct in New York, the Department of Homeland Security (DHS) revoked his parole. The Bureau of Immigration and Customs Enforcement (ICE), which is a part of DHS, has now detained petitioner in a county jail for more than 16 months with no bond hearing – that is, no opportunity to present his request for release pending the outcome of his asylum case to a neutral immigration judge. For the reasons set forth below, I respectfully recommend that the petition be granted, in part, and that respondents be ordered to provide Bermudez Paiz a prompt bond hearing at which the burden will be on the government to demonstrate that he is a flight risk or a danger to the community.

## I. BACKGROUND

### A. Pre-Petition Proceedings

Petitioner is a Salvadoran national. Verified Petition (Pet.) (Dkt. No. 1) ¶ 1. On February 10, 2016, he presented himself at a United States border crossing, with his girlfriend and their young daughter, and requested asylum. *Id.* ¶¶ 6, 18; Declaration of Deportation Officer Joseph T. Pujol (Pujol Decl.) (Dkt. No. 15) ¶ 3. DHS took petitioner into custody, Pet. ¶ 20; Pujol Decl. ¶ 3,

and shortly thereafter transferred him to the Pine Prairie Processing Center in Louisiana to await further proceedings. Pet. ¶ 20; Pujol Decl. ¶ 6.

**1. Credible Fear Interview**

As an "alien . . . arriv[ing] in the United States," petitioner was an "applicant for admission" as that term is used in the Immigration and Nationalization Act (INA), 8 U.S.C. § 1225(a)(1). DHS is required to inspect all applicants for admission. *Id.* § 1225(a)(3). If an applicant is "inadmissible" for specified reasons – including, as relevant here, because he is not in possession of a valid visa or other entry document, *see id.* § 1182(a)(7) – DHS "shall order the alien removed from the United States," unless he "indicates an intention to apply for asylum" or "a fear of persecution," *id.* § 1225(b)(1)(A)(i), in which case DHS is required to refer the alien for what is known as a "credible fear" interview by an asylum officer. *Id.* § 1225(b)(1)(A)(ii). The purpose of the interview is to determine whether "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum." *Id.* § 1225(b)(1)(B)(v). If DHS "determines at the time of the interview that an alien has a credible fear of persecution," then "the alien shall be detained for further consideration of the application for asylum." *Id.* § 1225(b)(1)(B)(ii). If the alien does not pass his credible fear interview, he may be "removed from the United States without any further hearing or review." *Id.* § 1125(b)(1)(B)(iii).

In accordance with the INA, DHS interviewed petitioner on March 24, 2016. Pet. ¶ 20; Declaration of Jennifer Vail (Vail Decl.) (Dkt. No. 1-1), Ex. H (transcript of interview). Petitioner stated, in substance, that he had witnessed certain events leading to an MS-13 gang murder in El Salvador; that the gang knew he was a witness and threatened him with death; and that he feared he would be killed by the gang, or by police officers allied with the gang, if he returned to his home. *Id.* On the basis of that interview, DHS determined that "there is a significant possibility

that the assertions underlying [petitioner's] claim could be found credible in a full asylum or withholding from removal hearing." Vail Decl. Ex. I, at ECF page 5.

On April 4, 2016, DHS commenced removal proceedings against petitioner by serving him with a Notice to Appear, Vail Decl. Ex. B, asserting that he was removable under 8 U.S.C. § 1182(a)(7)(A)(i)(I) because he was not in possession of valid entry documents.

**2. Grant of Parole**

Neither § 1225(b) nor § 1182 entitles an asylum applicant to a bond hearing before an immigration judge (IJ) during the pendency of his removal proceedings. Instead, under § 1182(d)(5)(A), the Secretary of Homeland Security (Secretary) may, in her discretion, "parole into the United States temporarily under such conditions as [she] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States."[1] Pursuant to 8 C.F.R. § 212.5(a), the authority of the Secretary to grant or deny parole may be exercised by a long list of ICE officials, including "directors of field operations; port directors; special agents in charge; deputy special agents in charge; associate special agents in charge; assistant special agents in charge; resident agents in charge; field office directors; deputy field office directors; chief patrol agents; [and] district directors for services."

[1] By its terms, § 1182(d)(5)(A) authorizes the "Attorney General" to grant parole "in his discretion." However, "[e]ffective March 1, 2003, the Immigration and Naturalization Service (INS), under the direction of the Attorney General, ceased to exist," and its functions were transferred to DHS, under the direction of the Secretary. *Vasquez v. Holder*, 602 F.3d 1003, 1006 n.3 (9th Cir. 2010) (citing the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002)). Accordingly, parole authority under 8 U.S.C. § 1182(d)(5)(A) was transferred from the Attorney General to the Secretary. *See Cruz-Miguel v. Holder*, 650 F.3d 189, 195 n.10 (2d Cir. 2011).

DHS has issued regulations governing the grant, denial, and revocation of humanitarian parole, *see* 8 C.F.R. § 212.5(b)-(e),[2] and ICE has issued a directive specifically addressing the grant of parole to aliens seeking asylum who have passed their credible fear interviews. *See* ICE Directive No. 11002.1, dated Dec. 8, 2009 (the Parole Directive).[3] Nonetheless, since both the grant of parole under § 1182(d)(5)(A) and its revocation are committed to the discretion of the Secretary, *see Ofosu v. McElroy*, 98 F.3d 694, 700 (2d Cir. 1996) ("parole is a matter of the Attorney General's discretion (and of the opinion of those she appoints)"), these decisions cannot

[2] Subsection (b) states that the parole of arriving aliens is generally "justified only on a case-by-case basis for 'urgent humanitarian reasons' or 'significant public benefit,' provided the aliens present neither a security risk nor a risk of absconding," and goes on to provide examples of aliens who may qualify for parole, including "[a]liens whose continued detention is not in the public interest as determined by those officials identified in paragraph (a) of this section." 8 C.F.R. § 212.5(b)(5). Subsection (d) explains that parole may be conditioned on "reasonable assurances that the alien will appear at all hearings and depart the United States when required to do so," such as "the giving of an undertaking" by the alien or a sponsor, and "periodic reporting of [the alien's] whereabouts." *Id.* § 212.5(d). Subsection (e) states that parole shall be revoked automatically, upon the alien's departure from the United States or the "expiration of the time for which parole was authorized." Alternatively, "when in the opinion of one of the officials listed in paragraph (a) of this section, neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien and he or she shall be restored to the status that he or she had at the time of parole." *Id.* § 212.5(e)(2)(i).

[3] Paragraph 1 of the Parole Directive, available at https://www.ice.gov/doclib/dro/pdf/11002.1-hd-parole_of_arriving_aliens_found_credible_fear.pdf (last visited Dec. 27, 2018), states that it "provides guidance" to field officers in exercising their discretion to "consider the parole of arriving aliens" who have passed their credible fear interviews. Paragraph 6.2 states that once an arriving alien has passed his or her credible fear interview and has "established to the satisfaction of [ICE] that he or she presents neither a flight risk nor danger to the community, [ICE] should, absent additional factors . . . parole the alien." Paragraph 6.5 states that when parole is denied, ICE "shall provide . . . a brief explanation of the reasons" for the denial. Paragraph 6.6 states that written notification of parole decisions "shall be provided . . . within seven days of the date an alien is initially interviewed for parole" unless there is "reasonable justification for delay." Paragraph 4.4 notes that parole "remains an inherently discretionary determination entrusted to the agency." Paragraph 10 states that the Parole Directive itself "is an internal policy statement of ICE" which "is not intended to, shall not be construed to, may not be relied upon to and does not create, any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States, its departments, agencies, or other entities, its officers or employees, or any other person." As of this writing, the Parole Directive remains in effect. *See* Resp. Mem. (Dkt. No. 16) at 18 n.4.

be appealed to immigration judges or the federal courts. *See* 8 C.F.R. § 1003.19(h)(2)(i)(B) (immigration judges "may not redetermine conditions of custody" of aliens in asylum proceedings); 8 U.S.C. § 1252(a)(2)(B)(ii) ("no court shall have jurisdiction to review . . . any [ ] decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is . . . in the discretion of the Attorney General or the Secretary"); *Giammarco v. Kerlikowske*, 665 F. App'x 24, 25 (2d Cir. 2016) (affirming dismissal of *habeas corpus* challenge to denial of request for discretionary parole because "[t]his language plainly erects a jurisdictional bar to a court's review of a discretionary immigration decision").

Moreover, the INA expressly states that parole "shall not be regarded as an admission of the alien," and that at the conclusion of any period of parole, "the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). Thus, in what has come to be known as the "entry fiction," *Traore v. Ahrendt*, 2018 WL 2041710, at *1 n.2 (S.D.N.Y. Apr. 30, 2018), aliens who are physically within the United States, with the permission of the government, are nonetheless "treated, for constitutional purposes, as if stopped at the border." *Id.* (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)); *see also Cruz-Miguel*, 650 F.3d at 197 n.12 ("Although aliens paroled under 8 U.S.C. § 1182(d)(5)(A) physically enter the United States temporarily, they are nevertheless deemed to remain constructively detained at the border.").

In April 2016, Bermudez Paiz was granted humanitarian parole pursuant to § 1182(d)(5)(A). Pet. ¶ 21. He was released from DHS custody on April 20, 2016, and traveled to New York to rejoin his family. *Id.*

### 3. Revocation of Parole

After residing in New York without incident more than one year, petitioner was arrested on May 12, 2017, and charged with two drug possession felonies, two misdemeanors, and two traffic infractions. Vail Decl. Ex. J. On August 11, 2017, he resolved all charges against him by pleading guilty to a single count of disorderly conduct in violation of N.Y. Penal Law § 240.20, and was sentenced to 15 days in jail. Pet ¶ 23; Vail Decl. Ex. J.[4] That same day, DHS revoked his parole, took him into custody, and detained him at the Orange County Jail in Goshen, New York, where he remains today. Pet. ¶ 24; Vail Decl. Ex. A; Pujol Decl. ¶ 16. Petitioner was never given "reasons for, or evidence supporting," the revocation of his parole. Pet. ¶ 27. He alleges, and respondents do not dispute, that he is held "in conditions identical to those of county jail inmates serving criminal sentences." Pet. ¶ 29. Among other things, petitioner "is brought to his immigration court hearings in a jail jumpsuit and with his hands shackled." *Id.*

On May 9, 2018 – almost nine months after he was re-detained – petitioner requested that parole be reinstated or that he be granted parole anew. Pet. ¶ 26; Vail Decl. Ex. E. ICE Field Office Director Thomas Decker denied parole, stating in a letter dated May 10, 2018:

> Upon a review of all of the aggravating and mitigating factors in his case, I have determined that there is no compelling reason to warrant a favorable exercise of discretion in his case.

---

[4] The offense to which petitioner pleaded guilty was a "violation," defined as an offense other than a traffic infraction "for which a sentence to a term of imprisonment in excess of fifteen days cannot be imposed." N.Y. Penal Law § 10.00(3). By contrast, a "misdemeanor" is an offense punishable by imprisonment more than fifteen days but less than one year, while a "felony" is an offense punishable by a longer sentence. *Id.* § 10.00(4), (5). Under New York law, only felonies and misdemeanors are classified as "crimes." *Id.* §10.00(6); *see also Greene v. Bryan*, 2018 WL 3539811, at *9 (E.D.N.Y. July 23, 2018) ("Disorderly conduct is only a violation, which means it is not a crime under New York law."). However, the federal courts are not bound by the classification of an offense under state law. *See, e.g.*, *Nowakowski v. New York*, 835 F.3d 210, 222 (2d Cir. 2016) (holding that conviction of a violation in New York is "criminal in nature" for purposes of a federal *habeas* proceeding challenging that conviction).

> Your Request for Release from Custody is therefore denied. Please be advised that there is no administrative appeal of this decision.

Return to Habeas Petition (Dkt. No. 14) Ex. 4. No further reasoning was provided. Petitioner's later request for reconsideration was also denied. Pet. ¶ 26; Vail Decl. Ex. F.

### B. Post-Petition Proceedings

Petitioner commenced this action on May 30, 2018, at which point he had been continually detained for more than nine months and had not yet had a merits hearing on his asylum application. Pet. ¶ 28.[5] His fundamental contention – asserted under a variety of statutory and constitutional theories – is that the government does not have the absolute and unbounded discretion to detain him, pending the final outcome of his asylum application, without affording him a hearing, before a neutral immigration judge, to determine whether he is a flight risk or a danger to the community. *See id*. ¶¶ 32, 36, 40-41, 45-46, 50-51, 57, 61.

---

[5] The respondents are ICE Field Office Director Decker; Kirstjen Nielson, the Secretary of DHS; Jefferson B. Sessions, the former Attorney General; and DHS itself. Pet. ¶¶ 7-10. Petitioner has arguably failed to name "the proper respondent," who is generally "the warden of the facility where the prisoner is being held." *Chan Lo v. Sessions*, 2017 WL 8786850, at *1 (S.D.N.Y. Sept. 15, 2017) (Woods, J.). *See Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004)) (the "default rule" in a § 2241 case "is that the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official"); *Singh v. Holder*, 2012 WL 5878677, at *2 (S.D.N.Y. 2012) (quoting *Zhen Yi Guo v. Napolitano*, 2009 WL 2840400, at *3 (S.D.N.Y. 2009)) ("a 'clear majority' of courts in this circuit have held that the 'immediate custodian' rule applies" in immigration cases). In recent months, the "clear majority" cited in *Singh* appears to have eroded. *See, e.g.*, *Calderon v. Sessions*, 330 F. Supp. 3d 944, 952 (S.D.N.Y. 2018) (holding that "in the immigration context, when a petitioner is detained in a local facility pursuant to [a contract] with a federal agency . . . then legal custodians [including Decker, Nielson, and Sessions] are proper respondents to both core and non-core challenges."). In this case, however, nothing hangs on the continued viability of the immediate custodian rule, because the government has made no objection to jurisdiction or venue on this basis, and the Orange County Jail is within this District. *See Skaftouros v. United States*, 667 F.3d 144, 146 n.1 (2d Cir. 2011) (retaining jurisdiction over petition naming "United States" as respondent after finding government waived objections); *cf. Chan Lo*, 2017 WL 8786850, at *1-2 (transferring § 2241 case brought by petitioner held in the Bergen County Jail to the District of New Jersey, because "jurisdiction lies only in the district where [the petitioner] is physically confined").

On June 4, 2018, the Hon. Gregory H. Woods, United States District Judge, referred the matter to me for report and recommendation. (Dkt. No. 5.) On June 5, 2018, I directed respondents to answer the Petition (Dkt. No. 7), and on July 30, 2018, after full briefing, I held oral argument, during which the parties informed me that petitioner's asylum hearing was scheduled to take place on August 8, 2018. In an order dated July 31, 2018 (Dkt. No. 20), I directed the parties to update the Court on the progress of petitioner's asylum application after the August 8 hearing.

By letters dated August 10 and September 25, 2018, petitioner reported that his asylum hearing went forward on August 8, 2018; that IJ Thomas Mulligan denied his application for relief from deportation on September 5, 2018; and that petitioner timely appealed that decision to the Board of Immigration Appeals (BIA). Pet. Letter dated Aug. 10, 2018 (Dkt. No. 21), at 3-4; Pet. Letter dated Sept. 25, 2018 (Dkt. No. 29), at 1. The BIA has not yet acted on the appeal.

On July 31, 2018, ICE interviewed petitioner in connection with a new request for parole; however, according to Bermudez Paiz, the interviewing officer was unaware of his parole history and did not have copies of his prior parole submissions. Pet. Letter dated Aug. 10, 2018, at 4. Almost two months later, on September 27, 2018, ICE once again denied parole, explaining, in a check-the-box notification form signed by respondent Decker, that petitioner failed to "establish[ ] to ICE's satisfaction" that he was not a flight risk or a danger to the community. Pet. Letter dated Oct. 2, 2018 (Dkt. No. 30), at 1 & Ex. 1. No further reasoning was provided. *Id*.

## II. ANALYSIS

28 U.S.C. § 2241 "authorizes a district court to grant a writ of *habeas corpus* whenever a petitioner is in custody 'in violation of the Constitution or laws or treaties of the United States.'" *Lopez v. Sessions*, 2018 WL 2932726, at *6 (S.D.N.Y. June 12, 2018) (quoting *Wang v. Ashcroft*, 320 F.3d 130, 140 (2d Cir. 2003)). Notwithstanding the jurisdiction-stripping provisions of 8 U.S.C. § 1252(a)(2)(B)(ii) and related statutes, the federal courts "have jurisdiction to hear habeas

corpus claims by non-citizens challenging the constitutionality of their detention" by ICE, *Lopez*, 2018 WL 2932726, at *6, including "challenges [to the] statutory framework that permits [their] detention without bail." *Demore v. Kim*, 538 U.S. 510, 516-17 (2003). *See also Zadvydas*, 533 U.S. at 688 ("The aliens here, however, do not seek review of the Attorney General's exercise of discretion; rather, they challenge the extent of the Attorney General's authority under the post-removal-period detention statute. And the extent of that authority is not a matter of discretion.").

Similarly, the federal courts retain jurisdiction to hear challenges to the process by which discretionary parole is granted, denied, or revoked. *See Damus v. Nielsen*, 313 F. Supp. 3d 317, 327 (D.D.C. 2018) (§ 1252(a)(2)(B)(ii) did not prevent the court from adjudicating petitioners' challenge to "the method by which parole is currently being granted (or denied)"); *Abdi v. Duke*, 280 F. Supp. 3d 373, 382 (W.D.N.Y. 2017) ("Because Petitioners do not challenge the ultimate decision to deny parole, but rather challenge the procedures employed when evaluating a parole request, this Court has subject matter jurisdiction to consider the parole claims."), *order clarified sub nom. Abdi v. Nielsen*, 287 F. Supp. 3d 327 (W.D.N.Y. 2018).

**A. Statutory Background**

As noted above, 8 U.S.C. § 1225(b), which governs the detention of arriving aliens while their asylum claims are pending, makes no provision for individualized bond hearings before an immigration judge. Similarly, inadmissible or deportable "criminal aliens," who are detained pursuant to 8 U.S.C. § 1226(c), have no statutory right to a bond hearing. *See Cabral v. Decker*, 331 F. Supp. 3d 255 (S.D.N.Y. 2018) (§ 1226(c), by its terms, mandates detention "without bond for the period of time while removal proceedings are pending").[6]

---

[6] The Secretary may release a "criminal alien" during the pendency of his removal proceedings, but only if she determines "that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal

These provisions stand in contrast to 8 U.S.C. § 1226(a), which authorizes DHS to arrest and detain an alien who is already present in the United States "pending a decision on whether the alien is to be removed from the United States." Section 1226(a) "governs the detention of aliens against whom the Government has initiated removal proceedings, but whose removal periods have not yet commenced." *Argueta Anariba v. Shanahan*, 190 F. Supp. 3d 344, 347 (S.D.N.Y. 2016) (quoting *Wang*, 320 F.3d at 146). Although the initial decision whether to release such an alien on bond is made by the Secretary, *see* 8 U.S.C. § 1226(a)(2), that determination is appealable to an immigration judge, who is authorized to "release the alien, and determine the amount of the bond, if any, under which [the alien] may be released," and thereafter to the BIA. 8 C.F.R. §§ 1236.1(d)(1), 1236.1(d)(3), 1003.19(a).

**B. Petitioner Is Detained Pursuant to § 1225(b)**

In his First Cause of Action, petitioner contends that he is "not properly subject to mandatory detention under 8 U.S.C. § 1225(b)" because that provision only applied "until [he was] found to have a viable asylum claim." Pet. ¶ 31. Once he passed his credible fear interview and was placed into removal proceedings, petitioner argues, "the proper basis for [his] detention" shifted to § 1226(a), which "entitles him to a prompt bond hearing before an IJ." *See* Pet. Mem. (Dkt. No. 3) at 14.

No relief should be granted on the First Cause of Action. Petitioner's argument is based entirely on his strained reading of § 1225(b)(1)(B)(ii), which states that, after passing a credible

---

activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the [Secretary] that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding." 8 U.S.C. § 1226(c)(2). The Secretary's release decisions under § 1226(c)(2), like her parole decisions under § 1182(d)(5)(A), are discretionary and unreviewable by immigration judges or the courts. *See* 8 U.S.C. § 1226(e) ("The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review.").

fear interview, "the alien shall be detained for further consideration of the application for asylum." According to petitioner, "for further consideration of the application for asylum" means "only until the time that removal proceedings are commenced," Pl. Mem. at 15, at which point the provisions of § 1226(a) come into play, including the right to have an immigration judge consider whether and under what conditions to release him. *Id.* at 15-18.

I have previously rejected this precise argument, as have other judges in this District. *See Tireus* v. *Decker*, 2018 WL 896047, at *10 (S.D.N.Y. Jan. 31, 2018) (Moses, M.J.) (§ 1225(b)(1)(B)(ii) "states, unambiguously, that an asylum applicant 'shall be detained' *after* passing a credible fear interview") (emphasis added), *report and recommendation rejected on other grounds*, 2018 WL 2426643 (S.D.N.Y. May 29, 2018); *Birch v. Decker*, 2018 WL 794618, at *5 (S.D.N.Y. Feb. 7, 2018) (Forrest, J.) (there is "absolutely no legal support" for the notion that an arriving alien who has passed a credible fear interview "is thereby immediately subject to § 1226(a)"). More importantly, the Supreme Court rejected it in *Jennings v. Rodriguez*, 138 S. Ct. 830, 845 (2018), explaining that § 1225(b) "mandate[s] detention of aliens throughout the completion of applicable proceedings and not just until the moment those proceedings begin." I therefore accept that petitioner is detained under § 1225(b) and analyze his remaining claims on that basis.

**C. Petitioner's Prolonged Detention Without a Bond Hearing Violates the Due Process Clause**

In his Sixth Cause of Action, petitioner asserts that regardless of the statutory provision under which he is held, his prolonged detention without an individualized bond hearing violates the Due Process Clause. Once an arriving alien has passed his credible fear interview and filed a potentially meritorious asylum application, petitioner argues, he must have some constitutional protection against indefinite detention without bond – particularly where, as here, the term of that

detention has stretched well beyond the six-month period used as a due process marker in other immigration contexts, and the alien is held in conditions indistinguishable from criminal detention. Pet. Mem. at 14-18, 23-29; Pet. Reply Mem. (Dkt. No. 17) at 5-9. He further argues that after 16 months in a county jail in Goshen, New York, the "entry fiction" cannot be relied upon to strip him of the minimal due process rights that would otherwise apply to a detained non-citizen in removal proceedings. Pet. Letter dated Aug. 10, 2018, at 2.

I agree, and I further agree that the facts specific to this case – including the extraordinary length of time that Bermudez Paiz has now been continuously incarcerated – require that he be given a prompt bond hearing before a neutral immigration judge.

**1. Supreme Court Case-law**

The Due Process Clause of the Fifth Amendment provides that "No person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "Freedom from imprisonment – from government custody, detention, or other forms of physical restraint – lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.

"It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Reno v. Flores*, 507 U.S. 292, 306 (1993). It is also well-established, however, that "Congress may make rules as to aliens that would be unacceptable if applied to citizens," *Demore*, 538 U.S. at 522, and that "certain constitutional protections available to persons inside the United States," lawfully or unlawfully, "are unavailable to aliens outside of our geographic borders." *Zadvydas*, 533 U.S. at 693. Thus, the nature and degree of the due process protection available to aliens in removal proceedings "may vary depending upon status and circumstance." *Id.* at 694.

To state these broad principles is little help in determining how much process is due, to which aliens, at what point in their removal proceedings. I start, therefore, by reviewing three relatively recent Supreme Court decisions: *Zadvydas*, *Demore*, and *Jennings*.

In *Zadvydas*, the Court considered the due process rights of two resident aliens who lost their immigration cases – that is, they had been ordered removed from the United States and those orders were final – but could not be deported.[7] Both aliens were detained pursuant to 8 U.S.C. § 1231(a), which governs the detention of aliens subject to final orders of removal. Section 1231(a)(2) states such an alien "shall" be detained for the 90-day "removal period" during which DHS is expected to effect the deportation. If for some reason the alien cannot be deported during that period, § 1231(a)(6) states that he "may be detained beyond the removal period," subject to periodic custody reviews conducted by ICE and committed to its discretion pursuant to 8 C.F.R. § 241.4. *See Zadvydas*, 533 U.S. at 683-84 (describing discretionary custody review procedures).

After confirming that 28 U.S.C. § 2241 "confers jurisdiction upon the federal courts to hear these cases," *Zadvydas*, 533 U.S. at 687, the Court began its constitutional analysis by noting that a "statute permitting indefinite detention of an alien would raise a serious constitutional problem" under the Due Process Clause, particularly given that civil immigration proceedings are "nonpunitive in purpose and effect." *Id.* at 690. The Court then closely analyzed the history and text of § 1231(a), finding no "clear indication of congressional intent to grant the Attorney General the power to hold indefinitely in confinement an alien ordered removed." *Id.* at 697.

[7] Kestutis Zadvydas was born in a displaced persons camp in Germany in 1948, to Lithuanian parents, and moved to the United States when he was eight years old. 533 U.S. at 684. After acquiring a lengthy criminal record, Zadvydas was ordered removed in 1994. *Id.* However, neither Germany nor Lithuania would accept him. *Id.* The second petitioner in *Zadvydas* was Kim Ho Ma, who was born in Cambodia but left at age two when his parents fled. *Id.* at 685. Ma was ordered removed in 1995, also based on his criminal record, but could not be deported to Cambodia as the United States had no repatriation treaty with that country. *Id.*

"Consequently, interpreting the statute to avoid a serious constitutional threat," the Court concluded that, "once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Id*. at 699. For the sake of "uniform administration in the federal courts," *id*. at 701, the Court then fashioned a bright-line test, holding that an alien is entitled to release (under "any of the various forms of supervised release that are appropriate in the circumstances") if, after six months of detention pursuant to § 1231(a), there is still "no significant likelihood of removal in the reasonably foreseeable future." *Id*. at 699, 701.

*Zadvydas* concerned aliens who were previously admitted into the country, not those who were denied admission entirely. 533 U.S. at 682. Justice Breyer, writing for the Court, highlighted this distinction, noting that aliens "who have not yet gained initial admission to this country would present a very different question," *id.*, and on that basis distinguishing *Zadvydas* from *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), which held that the indefinite detention of an alien "permanently excluded from the United States on [national] security grounds but stranded . . . on Ellis Island because other countries will not take him back" did not violate the Due Process Clause. *Mezei*, 345 U.S. at 207.

Four years later, the Court extended the *Zadvydas* rule to "inadmissible aliens" who were paroled into the country pursuant to § 1182(d)(5) but were later ordered removed and then detained, pending removal, pursuant to § 1231(a). *Clark v. Martinez*, 543 U.S. 371, at 378 (2005).[8]

---

[8] *Clark* consolidated the appeals of two Cuban nationals who came to the United States as part of the Mariel boatlift and were paroled into the United States under § 1182(d)(5)(A). 543 U.S. at 374. They later committed various crimes, rendering them ineligible for adjustment of status, and were ordered removed. However, since the U.S. Government was unable to repatriate them to Cuba, both were detained under § 1231(a) "well beyond six months after their removal orders became final," *id*. at 386, and both filed *habeas corpus* petitions arguing that since their removal was not "reasonably foreseeable," they were entitled to release. *Id*. Justice Scalia, writing for the Court, agreed, reasoning that the Court could not "sanction indefinite detention in the face of *Zadvydas*"

Together, *Zadvydas* and *Clark* stand for the proposition that the government may not indefinitely detain an alien subject to a final order of removal pursuant to § 1231(a).

*Demore v. Kim* concerned the rights of a lawful permanent resident (LPR) who was convicted of various "crimes of moral turpitude," rendering him a "criminal alien" and subjecting him to mandatory detention, pending his removal hearing, pursuant to 8 U.S.C. § 1226(c)(1)(B). 538 U.S. at 513-14. Kim challenged the constitutionality of the statute, relying on *Zadvydas* and arguing that his detention violated the Due Process Clause "because the INS had made no determination that he posed either a danger to society or a flight risk." *Id.* at 514. The Court rejected that challenge, reasoning that although aliens are entitled to "due process of law in deportation proceedings," *id*. at 523 (quoting *Flores*, 507 U.S. at 306), the government may constitutionally detain deportable aliens "during the limited period necessary for their removal proceedings." 538 U.S. at 526.

Chief Justice Rehnquist, writing for the Court in *Demore*, distinguished *Zadvydas* on the ground, *inter alia*, that the detention in *Zadvydas* was "indefinite" and "potentially permanent," 538 U.S. at 528 (quoting *Zadvydas*, 533 U.S. at 690-691), whereas detention under § 1226(c) "has a definite termination point" and "in the majority of cases it lasts for less than the 90 days we considered presumptively valid in *Zadvydas*." *Id*. at 529. The Court relied for this point on statistics furnished by the government, which reported that "the detention at stake under § 1226(c) lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal." *Id.* at 530.

---

without establishing "the dangerous principle that judges can give the same statutory text different meanings in different cases." *Id.*

Justice Kennedy, concurring, agreed that no bond hearing was required in "the circumstances of this case," but wrote that that a lawful permanent resident "could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified." *Demore,* 538 U.S. at 532 (Kennedy, J., concurring).

Most recently, in *Jennings*, the Court held – as a matter of statutory construction – that both § 1225(b) and § 1226(c) unambiguously call for the mandatory detention of aliens within their purview throughout the pendency of their removal proceedings, without any right to a bond hearing. 138 S. Ct. at 842, 845-847.[9] In so holding, the Court overruled the Ninth Circuit, which had applied the doctrine of constitutional avoidance to impose an implicit six-month limit on the period that an alien could be detained under those statues without a bond hearing. *Id.* at 839. Justice Alito, writing for the Court, explained that the constitutional-avoidance canon is an aid to the interpretation of a statute which could "plausibly be read" either to offend or to comport with the Constitution, *id*. at 843, but could not be used to "graft a time limit" onto an unambiguous statute that could not "reasonably be read to limit detention to six months." *Id*. at 833-844. Concluding from the language and structure of § 1225(b) and § 1226(c) that their meaning was "clear," the Court declined to extend the rule of *Zadvydas* to aliens detained under those provisions. *Id*. at 848.

*Jennings* did not reach the constitutional questions animating the lawsuit, such as whether the mandatory detention provisions of § 1225(b) and § 1226(c) violate the Due Process Clause, either facially or as applied to aliens whose detention has become unusually prolonged. Rather,

[9] *Jennings* arrived at the Supreme Court in the form of a class action on behalf of "all non-citizens within the Central District of California" who are or were detained for more than six months pursuant to § 1225(b), § 1226(a), or § 1226(c), pending the completion of their removal proceedings, and "have not been afforded a hearing to determine whether their detention is justified." 533 U.S. at 838-39.

the Court remanded the case to the Court of Appeals to consider those issues "in the first instance." *Id.*, 533 S. Ct. at 851.

Prior to the Supreme Court's decision in *Jennings*, the Second Circuit – like the Ninth – relied on the doctrine of constitutional avoidance to hold that an alien detained pursuant to § 1226(c) "must be afforded a bail hearing before an immigration judge within six months of his or her detention." *Lora v. Shanahan*, 804 F.3d 601, 616 (2d Cir. 2015). In reaching that decision, our Circuit agreed that "indefinite detention without being afforded a bond hearing would violate [an alien's] right to due process." *Id*. at 613. Shortly after *Jennings*, however, the Supreme Court granted certiorari in *Lora*, vacated the decision of the Court of Appeals, and remanded "for further consideration in light of *Jennings v. Rodriguez*." *Shanahan v. Lora*, 138 S. Ct. 1260 (2018).

**2. Post-*Jennings* Decisions**

In the ten months since *Jennings*, the Second Circuit has not yet revisited the constitutionality of mandatory detention under § 1226(c).[10] However, an ever-increasing number of judges in this District – following the logic of Justice Kennedy's concurrence in *Demore* and treating the constitutional analysis in *Lora* as persuasive, if no longer binding – have held that prolonged mandatory detention pending removal proceedings, without a bond hearing, "will – at some point – violate the right to due process." *Sajous v. Decker*, 2018 WL 2357266, at *8 (S.D.N.Y. May 23, 2018) (Nathan, J.) (directing bond hearing for criminal alien detained for eight months pursuant to § 1226(c)). *Accord Joseph v. Decker*, 2018 WL 6075067, at *11 (S.D.N.Y. Nov. 21, 2018) (Abrams, J.); *Dukuray v. Decker*, 2018 WL 5292130, at *5 (S.D.N.Y. Oct. 25, 2018) (Bricetti, J.); *Cabral*, 331 F. Supp. 3d at 262 (Koeltl, J.); *Vallejo v. Decker*, 2018 WL

[10] On remand in *Lora*, the Second Circuit dismissed the case as moot because, in the intervening period, the alien's removal was canceled. *Lora v. Shanahan*, 719 F. App'x 79, 80 (2d Cir. 2018).

3738947, at *6 (S.D.N.Y. Aug. 7, 2018) (Furman, J.); *Hernandez v. Decker*, 2018 WL 3579108, at *1 (S.D.N.Y. July 25, 2018) (Carter, J.).

Most judges who have squarely faced the question have applied the same logic to § 1225(b), holding that arriving aliens, like criminal aliens, cannot be detained for an unreasonably prolonged period of time without a bond hearing. *See Lett v. Decker*, 2018 WL 4931544, at *3 (S.D.N.Y. Oct. 10, 2018) (McCarthy, M.J.) (directing bond hearing for asylum applicant detained for ten months pursuant to § 1225(b)); *Ramirez Perez v. Decker*, 2018 WL 3991497, at *6 (S.D.N.Y. Aug. 20, 2018) (Caproni, J.) (directing bond hearing for asylum applicant held for nine months); *Brissett v. Decker*, 324 F. Supp. 3d 444, 452-53 (S.D.N.Y. 2018) (Swain, J.) (directing bond hearing for returning LPR detained as inadmissible under § 1225(b) for ten months).[11]

In *Sajous*, Judge Nathan held that the "six-month brightline rule" employed in *Lora* could no longer be relied on, after *Jennings*, to determine when an alien's detention has become so unreasonably prolonged as to violate the Due Process Clause. 2018 WL 2357266, at *10. Consequently, *Sajous* set out a multi-factor approach – similar to the tests adopted by the First, Third, Sixth, and Eleventh Circuits prior to *Jennings* – which takes into account not only "the length of time the alien has already been detained," 2018 WL 2357266, at *10, but also "whether the alien is responsible for the delay," *id.*; whether the alien "has asserted defenses to removal," *id.* at *11; "whether the alien's civil immigration detention exceeds the time the alien spent in

[11] *But see Poonjani v. Shanahan*, 319 F. Supp. 3d 644, 650 (S.D.N.Y. 2018) (Sullivan, J.) (holding that for an alien "at the threshold of initial entry" for immigration purposes, "the Constitution extends no farther than [the] statutory language" of § 1225(b), and therefore that an arriving alien may be detained indefinitely pursuant to § 1225(b) with no recourse); *Alexandre v. Decker*, No. 17-CV-5706 (GBD) (KHP), slip op. at 23-24 (S.D.N.Y. Aug. 28, 2018) (Parker, M.J.) (reasoning that even "arriving aliens" are entitled to "a base level of procedural due process," but that the discretionary parole process itself "satisfie[d] this base level of due process" for an asylum applicant detained for 21 months pursuant to § 1225(b)).

prison for the crime that rendered him removable," *id*. (quoting *Sopo v. U.S. Attorney Gen.*, 825 F.3d 1199, 1218 (11th Cir. 2016), *vacated*, 890 F.3d 952 (11th Cir. 2018)); and "whether the facility for the civil immigration detention is meaningfully different from a penal institution for criminal detention." *Id*. (quoting *Sopo*, 825 F.3d at 1218). Since then, "courts in the Southern District of New York have overwhelmingly adopted" the *Sajous* approach. *Dukuray*, 2018 WL 5292130, at *3; *see also Cabral*, 2018 WL 5421199, at *4 (collecting cases).

### 3. The Due Process Clause Applies to Asylum Applicants Detained on U.S. Soil Pursuant to § 1225(b)

Relying primarily on *Mezei* and *Poonjani*, the government argues strenuously that because Bermudez Paiz is an "arriving alien," who may be treated as if he were "at the border," he may also "be detained without the possibility of release pending admission or removal." Resp. Mem. at 10-11; *see also* Resp. Letter dated July 27, 2018 (Dkt. No. 19), at 2 ("*Mezei* remains good law and controls here"); Resp. Letter dated Aug. 10, 2018 (Dkt. No. 22), at 2 ("This Court should reach the same conclusion as Judge Sullivan" in *Poonjani*). I disagree.

To say that the due process rights of an arriving alien "extend[ ] no farther than the statutory language itself," *Poonjani*, 319 F. Supp. 3d at 650, is to say that an asylum applicant detained after presenting himself at the border and passing his credible fear interview has no due process rights at all; that is, that the Constitution provides no independent check upon the treatment meted out to him by the legislative or executive branches. Neither the Supreme Court nor the Second Circuit has so held. *See Brissett*, 324 F. Supp. 3d at 450. To the contrary: as the Court noted in *Zadvydas*, 533 U.S. at 694 (quoting *Wong Wing v. United States*, 163 U.S. 228, 238 (1896)), "all persons within the territory of the United States are entitled to the protection" of the Constitution. *See also Matthews v. Diaz*, 426 U.S. 67, 78 (1976) ("[A]ll persons, aliens and citizens alike, are protected by the Due Process Clause[.]"); *Jennings*, 138 S. Ct. at 862 (Breyer, J., dissenting) ("No one can

claim, nor since the time of slavery has anyone to my knowledge successfully claimed, that persons held within the United States are totally without constitutional protection.").

Moreover, with the exception of *Poonjani* itself, "the Court is not aware of a single case which holds that an arriving alien detained for removal proceedings in a U.S. detention facility on the mainland has *no* due process rights under the constitution." *Birch*, 2018 WL 794618, at *4 (emphasis in the original). Judge Forrest rejected that conclusion – describing it as offensive to "basic notions of fairness, justice, and liberty," *id*. at *7 – and held that "the relevant question . . . is not whether arriving aliens who have been detained in the U.S. are entitled to Due Process Clause protection, but rather the nature and scope of that protection." *Id*., at *4. *See also Lett*, 2018 WL 4931544, at *4 ("while arriving aliens' rights may be limited in other respects, they possess sufficient Due Process rights to challenge their prolonged mandatory detention" under § 1225(b)); *Ramirez Perez*, 2018 WL 3991497, at *3 (detainees held pursuant to § 1225(b) "have Due Process rights that require courts to consider challenges to the length of their detentions"); *Alexandre*, slip op. at 23 ("a base level of due process is always required").[12]

*Mezei* is not to the contrary, and does not control the outcome here. Unlike an asylum seeker who has passed a credible fear interview – and hence has colorable grounds for seeking admission to the United States – Ignatz Mezei had been "permanently excluded from the United

[12] Our District is not alone in this regard. *See*, *e.g*., *Rodriguez v. Marin*, 909 F.3d 252, at 256 (9th Cir. 2018) ("[w]e have grave doubts that any statute that allows for arbitrary prolonged detention without any process is constitutional"); *Destine v. Doll*, 2018 WL 3584695, at *3 (M.D. Pa. July 26, 2018) (holding that arriving aliens have "at least some entitlement to proper procedures" and collecting cases recognizing that aliens detained under § 1225(b) have the "basic due process right . . . to an individualized bond hearing once the length of their removal detention has become unreasonable"); *Otis V. v. Green*, 2018 WL 3302997, at *7 (D.N.J. July 5, 2018) (reaffirming that "aliens subject to detention as applicants for admission are entitled to Due Process Protections, albeit to a lesser extent than those which would apply to aliens . . . who are already considered to have entered the country").

States" after an extended sojourn behind the Iron Curtain, 345 U.S. at 207, and did not question the validity of the exclusion order. To the contrary: he spent more than a year applying (unsuccessfully) for entry to other countries (from his "temporary haven on Ellis Island," *id*.) before seeking to be admitted to the United States, on bond, "until arrangements [could be] made for his departure abroad." *Id*. His situation was thus more akin to that of the aliens in *Zadvydas* and *Clark*, who were subject to final orders of removal but could not be deported. *See Lett*, 2018 WL 4931544, at *4.

Moreover, *Mezei* – decided at the height of the Cold War – "explicitly tailored its holding to the national security context," *Lett*, 2018 WL 4931544, at *4, acknowledging that "[a]n exclusion proceeding grounded on danger to the national security . . . presents different considerations," in that admitting an alien barred on those grounds, even temporarily, "nullifies the very purpose of the exclusion proceeding." *Mezei*, 345 U.S. at 215-16. Thus, as a result of his exclusion order (which was in turn based on secret information that the government "declined to divulge" to the district court considering the bond application, "even in camera," *id*. at 209), Mezei was, in effect, conclusively presumed too dangerous to release on bond. *See Jennings*, 138 S. Ct. at 830 (Breyer, J., dissenting) (noting that the *Mezei* court denied bail "*after* the Attorney General had already found, on an individualized basis, not only that Mezei was a security risk and consequently not entitled to either admission or bail, but also that he could be denied a hearing on the matter because the basis for that decision could not be disclosed without harm to national security") (emphasis in the original). Those considerations are not present where, as here, an asylum applicant who has never been determined to be dangerous seeks a bond hearing at which the government would be free to present any evidence of dangerousness it possesses.

Finally, the statutory scheme underpinning the Court's analysis in *Mezei* "is no longer in force and effect; the category of excludable aliens that was considered in *Mezei* was eliminated" by the passage of the Illegal Immigration and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546 (1996), which is the statute implicated by petitioners held under § 1225(b). *Ramirez Perez*, 2018 WL 3991497 at *3 (quoting *Osias v. Decker*, 273 F. Supp. 3d 504, 510 (S.D.N.Y. 2017), *vacated*, 2017 WL 3432685 (S.D.N.Y. Aug. 9, 2017)).

For all of these reasons, I cannot read *Mezei* as holding "categorical[ly]" that arriving aliens have no due process rights beyond whatever procedures happen to be "authorized by Congress" at the time. *Poonjani*, 319 F. Supp. 3d at 649. The case is too tightly bound to its idiosyncratic facts to support such a stark conclusion. Rather, as Judge McCarthy explained in *Lett*: "*Mezei* may compel the conclusion that arriving aliens already excluded on national security grounds are not entitled to a bond hearing prior to their arranged deportation. However, *Mezei* does not compel the categorical conclusion that all arriving aliens may be subject to prolonged confinement without a bond hearing." 2018 WL 4931544, at *4. *See also Clerjuste v. Decker*, 2017 WL 6388952, at *4 (S.D.N.Y. Aug. 12, 2017) (Broderick, J.) ("*Mezei* did not hold . . . that nonresident aliens arriving at the border have no constitutional rights.").[13]

Arriving aliens subject to the "entry fiction" may possess fewer rights than other categories of aliens, but all persons physically on U.S. soil, regardless of their immigration status, "are entitled

[13] Because *Mezei* does not control this case, I do not reach the question whether it remains "good law," as Judge Sullivan concluded in *Poonjani*, 319 F. Supp. 3d at 649, or has been "undermined" by "subsequent developments" – a proposition that the *Zadvydas* court declined to analyze, 533 U.S. at 694, after determining that *Mezei* was distinguishable on its facts, but that the lower federal courts have continued to examine. *See, e.g.*, *Rosales-Garcia v. Holland*, 322 F.3d 386, 415 (6th Cir. 2003) ("[T]o the extent that we could conclude, in reliance on the Court's holding in *Mezei*, that the indefinite detention of excludable aliens is constitutionally permissible, we believe such a conclusion to be fatally undermined by the Court's later decisions.").

to *some* due process protection," *Birch*, 2018 WL 794618, at *6 (emphasis added), including protection from prolonged, indefinite, and otherwise unreviewable detention pursuant to § 1225(b). *Id.*[14] I therefore join my colleagues who have held – both before and after *Jennings* – that there comes a time when the government can no longer rely on the mandatory language of § 1225(b) to keep an arriving alien behind bars with no individualized showing that he or she presents a flight risk or a danger to the public. *See Birch*, 2018 WL 794618, at *6 (holding that "eleven months of detention without a bond hearing is too long"); *Ramirez Perez*, 2018 WL 3991497, at *6 (holding that after nine months in a "prison facility," petitioner's detention "is at this point unreasonable"); *Lett*, 2018 WL 4931544, at *5 (holding that petitioner's ten-month detention without access to a bond hearing "is unreasonable, and thus unconstitutional, as applied to him"); *Brissett*, 324 F. Supp. 3d at 452 (concluding that Brissett's nine-month detention "has been unreasonably prolonged and that he therefore is entitled to an individualized determination as to his risk of flight and dangerousness to the community").

---

[14] Because the grant of parole pursuant to § 1182(d)(5)(A) is "entirely discretionary," with discretion vested in the same agency charged with removing inadmissible aliens, "it provides no actual due process protection for persons facing indefinite detention under § 1225(b)." *Birch*, 2018 WL 794618, at *7. Moreover, even though the Parole Directive instructs ICE officers to consider "[e]ach alien's eligibility for parole . . . on its own merits" and to parole those who present neither a flight risk nor a danger to the public, *id*. ¶ 6.2, parole approval rates have plummeted under the current administration, to the point where parole has been "effectively eliminated as an option" in the Detroit, El Paso, Los Angeles, Newark, and Philadelphia ICE Field Offices. *Damus*, 313 F. Supp. 3d at 326 (describing "overwhelming evidence" showing that parole approval rates fell from above 90% "just a few years ago" to below 10% in 2017, *see id*. at 340-41, and issuing a preliminary injunction requiring ICE to adhere to the Parole Directive). It thus appears that the parole process is vulnerable to political pressure, further undermining any argument that it can be relied on to furnish even a "base level of due process." *Alexandre*, slip op. at 23.

### 4. Petitioner's Detention Has Become Unreasonable

Whether an individual alien's mandatory detention has become prolonged "is a fact-dependent inquiry requiring an assessment of all the circumstances of any given case." *Ramirez Perez*, 2018 WL 3991497, at *4 (quoting *Sajous*, 2018 WL 2357266, at *10). In considering those circumstances, I am guided by the *Sajous* factors, which – as relevant here – are: (1) the length of time the petitioner has already been detained; (2) whether the petitioner or the government is primarily responsible for the delay; (3) whether the petitioner has colorable defenses to removal; and (4) whether the conditions under which the petitioner is confined are meaningfully different from the conditions experienced by those serving criminal sentences. 2018 WL 2357266, at *10-11.[15] I will also consider two additional factors, found relevant by courts in this District both before and after *Sajous*: (5) "whether the continued duration of the detention is finite or near conclusion," *Vallejo*, 2018 WL 3738947, at *3 (quoting *Young v. Aviles*, 99 F. Supp. 3d 443, 455 (S.D.N.Y. 2015)); and (6) "the interests served by the continued detention." *Id.*

The first and "most important" *Sajous* factor, 2018 WL 2357266, at *10, weighs heavily in favor of granting the petition. Bermudez Paiz has now been continuously detained for more than 16 months since his parole was revoked in August 2017 – significantly longer than the periods found unreasonable in the cases discussed above, and well beyond the "brief period" (averaging "about five months" when the alien "chooses to appeal") deemed reasonable in *Demore*, 538 U.S. at 530.

---

[15] In *Sajous*, Judge Nathan also wrote that it "may also be relevant" whether "the alien's civil immigration detention exceeds the time the alien spent in prison for the crime that rendered him removable." 2018 WL 2357266, at *11 (quoting *Sopo*, 825 F.3d at 1218). Bermudez Paiz was sentenced to a mere 15 days in jail before his immigration parole was revoked. However, he was not placed in removal proceedings because of the violation for which he was sentenced. Rather, he was deemed inadmissible at the border. Consequently, this *Sajous* factor does not apply neatly to the case at bar.

The "likely duration of continued detention" is also "pertinent." *Sajous*, 2018 WL 2357266, at *10. Bermudez Paiz timely appealed the IJ's decision on September 24, 2018. Pet. Letter dated Sept. 25, 2018, at 1. The median wait time for a BIA decision in fiscal year 2015 (ended September 30, 2015) was 224 days, or roughly seven and a half months. *See* United States Government Accountability Office, *IMMIGRATION COURTS: Actions Needed to Reduce Case Backlog and Address Long-Standing Management and Operational Challenges* (June 2017), at 32-33 (available at https://www.gao.gov/products/GAO-17-438 (last visited Dec. 27, 2018)). Even assuming that this remains an accurate figure in light of the current backlog in the immigration courts,[16] Bermudez Paiz is likely to wait additional months before the BIA rules on his case, further weighing in favor of his petition. *See Lett*, 2018 WL 4931544, at *5 (granting bond hearing where there was "significant reason to believe" that the alien "would remain detained through the course of an appeal by either side").

The second *Sajous* factor also supports a finding that petitioner's detention has become unreasonably prolonged. Respondents point out that proceedings in immigration court were "adjourned several times because of [petitioner's] own decisions about changing or retaining counsel." Resp. Mem. at 16. A review of the record, however, reveals that these decisions delayed petitioner's merits hearing by – at most – 16 weeks in the aggregate, representing approximately 22% of the time he has been detained.[17] Moreover, there is no evidence that Bermudez Paiz acted

[16] Since the end of FY 2015, the overall backlog has risen some 77%, from 456,216 cases at the end of September 2015 to 809,041 cases as of November 2018. *See* Transactional Records Access Clearinghouse, *Immigration Court Backlog Tool*, available at http://trac.syr.edu/phptools/immigration/court_backlog/ (last visited Dec. 27, 2018).

[17] *See* Pujol Decl. ¶ 18 (6-week adjournment because petitioner's first attorney "had moved to withdraw"); *id.* ¶¶ 20-21 (5-week adjournment because petitioner's second attorney had also moved to withdraw, apparently because petitioner "could not afford counsel"); *id.* ¶ 24 (5-week adjournment because petitioner accepted *pro bono* representation by the Legal Aid Society).

in bad faith, created delay through frivolous motions, or otherwise attempted to "gam[e] the system" to obtain a bond hearing. *Sajous*, 2018 WL 2357266, at *10.

The third *Sajous* factor – whether petitioner has defenses to removal – militates neither for nor against the relief sought. While petitioner's asylum application "would be a complete defense to removal" if granted, *Lett*, 2018 WL 4931544, at *5, that application was denied by the IJ, and is now on appeal to the BIA. As a result, this factor does not weigh in petitioner's favor, as it did in those cases where an IJ had *not* yet ruled on petitioner's defenses to removal. *See id.* at *5; *Cabral*, 331 F. Supp. 3d at 261-262. Neither does it weigh against petitioner, however, given that he passed his credible fear interview and has a pending appeal to the BIA. Moreover, respondents do not argue that petitioner's asylum claim lacks merit. On these facts, I do not assign the third *Sajous* factor significant weight in either direction.

The fourth factor weighs in favor of the relief that petitioner seeks, since he is confined "in an actual jail," *Sajous*, 2018 WL 2357266, at *11, under conditions "identical to those of county jail inmates serving criminal sentences." Pet. ¶ 29. *See Hernandez*, 2018 WL 3579108, at *10 (S.D.N.Y. July 25, 2018) (granting bond hearing where petitioner was detained in a "penal institution" where he was "subject to 'identical' conditions as individuals held in criminal custody"); *Lett*, 2018 WL 4931544, at *5 (granting hearing where asylum seeker was "detained in a county jail that is used for criminal detention").

---

Another three-week adjournment was granted, at the request of petitioner's counsel, due to a pending Freedom of Information Act (FOIA) request. Pujol Decl. ¶ 19. Respondents argue that this delay should also be attributed to Bermudez Paiz. *See* Resp. Mem. at 16. Judge Nathan rejected that argument in *Sajous*, finding that delays in obtaining evidence from the government via FOIA requests are properly attributed to the government. 2018 WL 2357266, at *11. I agree, and consequently do not hold petitioner "primarily responsible" for the delays associated with his FOIA request.

The additional *Young/Vallejo* factors, as relevant here, also point to the conclusion that petitioner's detention has become unreasonable. Although his detention is in theory finite – ending with a final decision on his asylum application, which is his only defense to removal – "it is likely," as a practical matter, that his incarceration "will approach, if not surpass, two years," *Vallejo*, 2018 WL 3738947, at *5, due to factors which are now entirely beyond his control.

Finally, I note that the "interests served" by the detention of arriving aliens under § 1225(b) are the same as those justifying detention under other immigration statutes: "ensuring the presence" of the aliens at their immigration proceedings (and their amenability to deportation if they lose), and "protecting the public" from "dangerous" aliens. *Demore*, 538 U.S. at 515. *See also* Parole Directive ¶ 6.2 (parole should be granted to asylum applicants who "present[ ] neither a flight risk nor danger to the community"). In *Demore*, the Court concluded that these interests justified the relatively brief detention of "criminal aliens" during the "limited period necessary for their removal proceedings," *id*. at 526, especially given the "increasing rates of criminal activity by aliens" during the 1990s, when Congress adopted § 1226(c), *id*. at 518, and statistical evidence showing that "one out of four criminal aliens released on bond absconded prior to the completion of his removal proceedings." *Id*. at 520. Petitioner is not a "criminal alien" as that term is used under the INA. *See* 8 U.S.C § 1226(c). Insofar as the record reveals, his only conviction has been on a single count of disorderly conduct, which New York State does not consider a crime. Moreover, respondents have made no showing that asylum applicants as a class "abscond" at alarming rates, or that Bermudez Paiz missed any court appearances while on parole. In any event, both flight risk and dangerousness can be – and indeed must be – considered at the bond hearing that petitioner seeks. Thus, the interests served by petitioner's detention do not make it reasonable to continue that detention, well into its second year, without such a hearing.

In sum, petitioner has now been detained for more than 16 months in a county jail, with no clear end in sight, while he pursues a non-frivolous asylum application. At no point during this period has the government demonstrated that he is a flight risk or a danger to the public. As these are the only legitimate justifications for his continued civil confinement, I conclude that petitioner's detention has become unreasonably prolonged, in violation of the Due Process Clause.

**5. Petitioner is Entitled to a Bond Hearing at which the Government Bears the Burden of Proof**

The only remaining question concerns the burden of proof at the bond hearing. Petitioner seeks a hearing at which "D.H.S. is required to show by clear and convincing evidence that Mr. Bermudez Paiz is a danger to the community or a risk of fight." Pet. at 18 (Prayer for Relief ¶ 3). Respondents, who argue that petitioner has already had all the process he is due, do not discuss what additional process might be required if the Court were to disagree. Respondents have therefore "waived this argument." *Sajous*, 2018 WL 2357266, at *12.

Moreover, the overwhelming consensus of judges in this District – both before and after *Jennings* – is that once an alien's immigration detention has become unreasonably prolonged, he or she is entitled to a bond hearing at which the government bears the burden to "demonstrate dangerousness or risk of flight by clear and convincing evidence." *Hernandez*, 2018 WL 3579108, at *10 (petitioner held pursuant to § 1226(c)). "The mere possibility of removal does not meaningfully distinguish immigration detention from other types of civil commitment," at which the clear and convincing standard is typically imposed on the government. *Id.*; *see also Lora*, 804 F.3d at 616 (establishing "clear and convincing" standard for § 1226(c) detainees held for more than six months); *Brissett*, 324 F. Supp. 3d at 447-448 (applying same standard where petitioner was an LPR held pursuant to § 1225(b)); *Ramirez Perez*, 2018 WL 3991497, at *6 (same, where

petitioner was an asylum applicant held pursuant to § 1225(b)); *Lett*, 2018 WL 4931544, at *6 (same).[18]

These cases are soundly reasoned. I therefore recommend that respondents be ordered to provide petitioner a prompt bond hearing, before a neutral IJ, and that he be admitted to bail, on such conditions as the IJ deems appropriate, unless the government can demonstrate, by clear and convincing evidence, that he presents an unreasonable flight risk or danger to the community.

**D. Petitioner's Remaining Claims Lack Merit**

In his Second, Third, Fourth, and Fifth Causes of Action, petitioner challenges the revocation of his parole in August 2017, arguing that respondents (i) violated the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), by revoking his parole without showing changed circumstances; (ii) violated his due process rights under the Fifth Amendment by revoking his parole without notice and an opportunity to be heard; (iii) infringed his right to be free from unreasonable searches and seizures under the Fourth Amendment by detaining him without "probable cause," and (iv) violated the INA itself, because § 1226(b), properly construed under the doctrine of constitutional avoidance, does not "authorize procedure-less revocations of immigration paroles." Pet. ¶¶ 33-51. In his Seventh Cause of Action, petitioner alleges that the "categorical denial of bail to certain noncitizens violates the right to bail encompassed by the Eighth Amendment." *Id.* ¶ 60.

[18] In *Vallejo*, the court placed the burden on the petitioner, but only because that petitioner had already received one "individualized bond hearing" and sought a second hearing based on "changed circumstances." 2018 WL 3738947, at *3. Judge Furman recognized that "a strong argument can be made that due process requires the Government to show at an *initial* bond hearing that detention is justified by clear-and-convincing evidence." *Id.* at *6 (emphasis added).

Should my recommendation with respect to the Sixth Cause of Action be accepted, the Petition may be disposed without reaching these claims. Nonetheless, I address each, briefly, to explain why – in my view – none of them warrants *habeas* relief.

**1. APA – Changed Circumstances**

In his Second Cause of Action, petitioner argues that the revocation of his parole was "arbitrary and capricious," and therefore violated the APA, 5 U.S.C. § 706(2)(A), because the agency failed to abide by the BIA's decision in *Matter of Sugay*, 17 I. & N. Dec. 637, 640 (BIA 1981), which stated that "where a previous bond determination has been made by an immigration judge, no change should be made by a District Director absent a change of circumstance." Pet. Mem. at 18-19. In this case, however, no bond determination was ever made "by an immigration judge." *Sugay* is therefore inapplicable.[19] Even if applicable, *Sugay* would not entitle petitioner to relief, because his circumstances did in fact change just before DHS revoked his parole: petitioner pled guilty to, and was sentenced for, a violation of the state penal law. Pet. ¶ 23; Vail Decl. Ex. I. Although the criminal case was largely resolved in his favor, petitioner cannot contend that his conviction and sentence, while on discretionary parole, did not constitute a "change of circumstance."[20]

---

[19] The government's statement, made in a brief filed in a different case, raising different issues, that DHS "generally only re-arrests an alien pursuant to § 1226(b) after a material change in circumstances," regardless of whether the original bond determination was made by an immigration judge or an ICE officer, *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1197 (N.D. Cal. 2017), *aff'd sub nom. Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018), is not sufficient to render the *Sugay* rule binding on ICE and enforceable by this Court in this case.

[20] In his traverse (reply) brief, petitioner includes a second APA argument, not found in his Petition or his opening brief: that DHS violated the APA in connection with "its denial of Petitioner's 2018 parole request" because it failed at that time to comply with its own Parole Directive, which required faster action and an "individualized determination of Petitioner's flight risk and danger." Pet. Reply Mem. at 3. DHS is indeed required to abide by the Parole Directive. *See Damus*, 313 F. Supp. 3d at 337; *Abdi*, 280 F. Supp. 3d at 379. However, it is not clear whether that Directive

### 2. INA – Statutory Construction

Turning to the INA itself, petitioner alleges in his Fifth Cause of Action that the revocation of his parole violated 8 U.S.C. § 1226(b), because § 1226(b) should be construed, in accordance with the doctrine of constitutional avoidance, to "require a minimum degree of procedural protections" for the revocation of parole granted pursuant to § 1226(a). Pet. ¶¶ 49-50. Those "minimum" protections, according to petitioner, include "notice of the intention to revoke parole," service of the evidence justifying revocation, a hearing before a neutral arbitrator (at which DHS has the burden of "establish[ing] by clear and convincing evidence changed circumstances material to whether the noncitizen poses a flight risk or a danger to the public"), the right to counsel, and the right to appeal an adverse decision. *Id*. ¶ 50.

Petitioner's statutory construction argument cannot succeed. *First*, as discussed above, he was detained pursuant to § 1225(b), not § 1226(a), and was paroled pursuant to § 1182(d)(5)(A), not § 1226(a)(2) (authorizing the Secretary to release an alien previously detained pursuant to § 1226(a) on "bond" or "conditional parole"). Section 1226(b), which governs the revocation of "a bond or parole authorized under subsection (a)" of the same statute, thus has nothing to say about the manner in which petitioner was re-detained by DHS.

*Second*, even if § 1226(b) applied, it would be of no assistance to petitioner. The statute reads, in full: "The [Secretary] at any time may revoke a bond or parole authorized under

---

applied, by its terms, to petitioner's 2018 parole denial. Both the language and the structure of the Directive suggest that it is designed primarily to guide DHS in its processing and assessment of initial requests for humanitarian parole, beginning "as soon as practicable following an initial credible fear determination." Parole Directive ¶ 6.1. Nothing in the Directive so much as mentions reinstatement requests (or new parole applications) following revocation of a previous grant of parole. Moreover, petitioner waived his second APA argument by failing to raise it in his moving brief. *See Pineda v. Shanahan*, 258 F. Supp. 3d 372, 380 n.11 (S.D.N.Y. 2017) (argument raised for first time on reply is waived).

subsection (a), rearrest the alien under the original warrant, and detain the alien." 8 U.S.C. § 1226(b). Nothing in this brief text even hints that the procedural protections listed in petitioner's brief are required. The doctrine of constitutional avoidance "is a tool for choosing between *competing plausible interpretations* of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark*, 543 U.S. at 381 (emphasis added). It does not "give a court the authority to rewrite a statute as it pleases." *Jennings*, 138 S. Ct. at 843. In *Jennings,* the Court rejected the argument that either § 1225(b) or § 1226(c) could "reasonably be read to limit detention to six months," *id*. at 844, where no hint of that limit (or, indeed, of any limit to mandatory detention) could be found in the text or history of the statute. *Id*. at 843. By the same token, there is no plausible interpretation of § 1226(b) that would transform it from a statute granting the Secretary uncabined revocation authority into a laundry list of restrictions on that authority.

**3. Fifth Amendment – Notice and Hearing**

In his Third Cause of Action, petitioner contends that an arriving alien, once granted parole, cannot be re-detained without the full panoply of procedural rights ordinarily associated with revocation of criminal parole, including "notice of the intention to detain and the justification for detention, service of the evidence proving the justification for detention, the right to contest the allegations and be represented by counsel, and an opportunity to appeal the revocation determination." Pet. ¶ 40 (citing *Morrisey v. Brewer*, 408 U.S. 471 (1972)); *see also* Pet. Mem. at 21-22 (petitioner's re-detention "violate[d] a liberty interest that cannot be unilaterally revoked without adequate due process under the Fifth Amendment").

As applied to the revocation of humanitarian parole granted pursuant to § 1182(d)(5)(A), petitioner's Fifth Amendment claim fails at the first hurdle. Because the statute "makes clear that whether and for how long temporary parole is granted are matters entirely within the discretion of

the Attorney General," it "does not create any liberty interest in temporary parole that is protected by the Fifth Amendment." *Kwai Fun Wong v. United States*, 373 F.3d 952, 968 (9th Cir. 2004) (affirming dismissal of claim that the revocation of petitioner's § 1182(d)(5)(A) parole violated the Due Process Clause). *Accord Gisbert v. U.S. Atty. Gen.*, 988 F.2d 1437, 1443 (5th Cir. 1993) (since § 1182(d)(5)(A) "does not require the Attorney General to parole any alien," petitioners had "no liberty interest" in being paroled under § 1182(d)(5)(A) and consequently were not entitled to "the same due process rights to the initial revocation of their immigration parole as those granted to criminal parolees"), *amended*, 997 F.2d 1122 (5th Cir. 1993). As the Second Circuit explained in *Ofosu*, since immigration parole "is a matter of the Attorney General's discretion," it "may be ended without hearings or special forms." 98 F.3d at 700.[21]

### 4. Fourth Amendment – Probable Cause

Expressly likening the revocation of immigration parole under § 1182(d)(5)(A) to a criminal arrest, petitioner contends in his Fourth Cause of Action that his re-detention, without a judicially-reviewed "probable cause" determination, violated his Fourth Amendment right to be free from unreasonable seizures. Pet. ¶¶ 44-45; *see also* Pet. Mem. at 14 ("there is no evidence of any cause – let along probable cause – to justify the re-detention of Mr. Bermudez Paiz on or about August 11, 2017").

[21] As noted above, the regulations governing humanitarian parole under § 1182(d)(5)(A) call for "written notice" when DHS determines that "neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States." 8 C.F.R. § 212.5(e)(2)(i). However, the regulatory language does not specify that the notice must be provided in advance, and there are obvious reasons why, at least in certain circumstances, advance notice of DHS's intent to revoke parole would be ill-advised. Thus, while petitioner complains that he was not provided with notice of DHS's "intention to re-detain" him, *see* Pet. Mem. at 22, he does not tie that argument to the language of § 212.5(e)(2)(i). Nor does he argue that DHS failed in any other respect to comply with § 212.5(e)(2)(i).

Petitioner is of course correct that "the Fourth Amendment requires government agents to have probable cause to arrest an individual whom they believe has committed a crime." Pet. Mem. at 9 (citing *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)). Similarly, "an immigration agent must have probable cause to arrest a person for a suspected immigration violation." *Id.* (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82 (1975)). But petitioner was not arrested because he was suspected of a crime or an immigration violation. He was re-detained because DHS terminated his humanitarian parole, which it was authorized to do whenever "in the opinion" of an appropriate ICE officer "neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States." 8 C.F.R. § 212.5(e)(2)(i); *Ofosu*, 98 F.3d at 700.

As a matter of logic, it makes little sense to demand that DHS present "evidence," at a probable cause hearing, to "justify" that which it is entitled to do without any. As a matter of law, the Fourth Amendment – which, like the Fifth, provides "the most protection" to citizens and lawful residents and "the least" to non-admitted aliens, *Tungwarara v. United States*, 400 F. Supp. 2d 1213, 1218 (N.D. Cal. 2005) – cannot protect an arriving alien, paroled into the United States pursuant to § 1182(d)(5)(A), from being re-detained in accordance with that statute's implementing regulations.

**5. Eighth Amendment – Right to Bail**

In his Seventh Cause of Action, petitioner relies on Justice Breyer's dissent in *Jennings* to argue that that any "categorical denial of bail" to noncitizens – such as under § 1225(b) – violates the "right to bail encompassed by the Eighth Amendment." Pet. ¶¶ 60-61. However, recognizing that "[t]he cases before us . . . are not criminal cases," 138 S. Ct. at 864, Justice Breyer rested his dissent on the Fifth Amendment's Due Process Clause, not the Eighth Amendment's Excessive Bail Clause. *See id.* at 862 (Breyer, J. dissenting) ("The Due Process Clause foresees eligibility for bail as part of 'due process.'"). Where, as here, the detention is civil in nature, the Eighth

Amendment simply does not apply. *See generally I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1038, (1984) ("Consistent with the civil nature of the proceeding, various protections that apply in the context of a criminal trial do not apply in a deportation hearing.").

## III. CONCLUSION

For the reasons set forth above, I conclude that petitioner is entitled to relief on his Sixth Cause of Action. Consequently, I respectfully recommend that the Petition be granted, in part, and that respondents be ordered to provide Bermudez Paiz a prompt bond hearing, before an immigration judge, at which the burden will be on DHS to demonstrate by clear and convincing evidence that petitioner is a flight risk or a danger to the community.

Dated: New York, New York
December 27, 2018

**BARBARA MOSES**
**United States Magistrate Judge**

## NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have 14 days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). *See also* Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the Hon. Gregory H. Woods at 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned magistrate judge. Any request for an extension of time to file objections must be directed to Judge Woods. **Failure to file timely objections will result in a waiver of such objections and will preclude appellate review.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).